NOT DESIGNATED FOR PUBLICATION

No. 112,805

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

FRANK CRUDO,
*Appellee*.


MEMORANDUM OPINION

Appeal from Geary District Court; STEVEN L. HORNBAKER, judge. Opinion filed November 13, 2015. Reversed and remanded with directions.

*Tony Cruz*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Robert A. Thompson*, of Salina, for appellee.

Before ATCHESON, P.J., BUSER and GARDNER, JJ.


BUSER, J.:  The State of Kansas appeals a district court order suppressing 19 pounds of marijuana seized by the Geary County Sheriff's Department from a trailer owned by Frank Crudo. This search and seizure resulted in Crudo being charged with three felony and one misdemeanor drug crimes. For reasons discussed in this opinion, we reverse the suppression order and remand the case to the district court for a new evidentiary hearing before another district judge with directions to reconsider the motion and make appropriate findings of fact and conclusions of law.

FACTUAL AND PROCEDURAL BACKGROUND

On January 28, 2014, the State charged Crudo with possession of marijuana with the intent to distribute (K.S.A. 2014 Supp. 21-5705[a][4] and [a][7]); conspiracy to possess marijuana with the intent to distribute (K.S.A. 2014 Supp. 21-5302[a]); no drug stamp (K.S.A. 79-5204[a] and K.S.A. 79-5208); and possession of marijuana (K.S.A. 2014 Supp. 21-5706[b][3] and/or [b][7]). Crudo filed a pretrial motion to suppress the contraband.

On October 22, 2014, the parties appeared before the Honorable Steven Hornbaker for an evidentiary hearing on Crudo's motion to suppress evidence. The State presented testimony from two Geary County Sheriff's Deputies, Christopher Ricard and Justin Stopper. According to their testimony, the deputies were parked in separate patrol cars in the median of Interstate 70 at about 11 p.m. on January 23, 2014. The deputies had parked parallel to each other, driver's-side door to driver's-side door, with Deputy Ricard facing west just south of the westbound lanes and Deputy Stopper facing east just north of the eastbound lanes. Both deputies had their windows down and were conversing.

Deputy Ricard testified that he noticed a vehicle approaching in an eastbound lane. The vehicle was a 2002 Ford F-250 four-door pickup truck and it was towing a 1999 Jayco fifth-wheel camper trailer. The deputy estimated the vehicle's speed at about 70 miles per hour.

As the pickup went by, Deputy Ricard turned his head to the left and noticed the tail lamp on the trailer was not illuminating the rear registration plate (license plate). Without sufficient illumination, the deputy could not discern the jurisdiction of the license plate in the darkness. The deputy clarified on cross-examination that he could see the tail lamp was lit, but the light from the lamp was not shining onto the license plate.

2

Deputy Stopper similarly testified that he observed the trailer as it passed and saw the license plate was not illuminated. The deputy was probably 20 feet from the trailer as it passed his location. As a result, Deputy Stopper could not determine the jurisdiction, any numbers or letters, or the presence of an expiration sticker on the license plate.

The district court admitted in evidence State's Exhibit 1, a photograph of the trailer's license plate taken in a well-lit warehouse. The photograph shows the license plate was mounted on a bracket which extended about an inch from the trailer's shell and that the top edge of the plate was partially bent outwards. The tail lamp was attached to the vehicle above the license plate but centered over the portion of the plate that was bent outwards.

Deputy Ricard decided to follow the pickup because the license plate was not properly illuminated, in violation of state motor vehicle law. When the deputy's headlights shown on the rear of the trailer, he was able to read that the license plate was issued from North Carolina. Deputy Ricard then radioed the information regarding the license plate to the dispatcher.

Deputy Stopper testified that he was monitoring Deputy Ricard's communications with the dispatcher. Both deputies testified the dispatcher advised that "there was no record" of the trailer's registration and that it was "not on file." Deputy Ricard testified that he asked the dispatcher "if they ran [the license plate] as a trailer" and requested confirmation of the result. Deputy Ricard was informed the registration "was still not coming back." Deputy Stopper confirmed that Deputy Ricard had a lengthy conversation with the dispatcher regarding the trailer's registration. After following the vehicle for about 5 miles, Deputy Ricard stopped the pickup and trailer. At the scene of the traffic stop, Deputy Stopper provided backup assistance to Deputy Ricard.

Deputy Ricard testified that he walked from his patrol vehicle to the passenger side of the trailer and finally to the passenger side of the pickup. The deputy did not smell anything unusual while walking alongside the trailer, but as soon as the driver rolled down a passenger-side window on the pickup, Deputy Ricard smelled "a strong odor of raw marijuana."

The driver of the pickup was identified as James Driggers, who was not charged in this case. Crudo was a passenger in the back seat and the owner of the pickup and trailer.

During the stop, Deputy Ricard asked Driggers about his travel plans. Driggers said the men were on a week-long trip from North Carolina to Redding, California, and back again. Driggers said they made the trip to "visit the Redwoods." Deputy Ricard testified that Driggers also said the pair "were out there to see Mr. Crudo's brother who lived out there. And then I asked them later if he went to see Mr. Crudo's friend, and he said yes." Driggers said he worked in residential construction.

Deputy Ricard testified he was skeptical the two men would pull a "35-foot long fifth-wheel all the way from North Carolina out to Redding, California, for a week-long trip, total. Just the money-sense, or what it would cost for fuel to drive all the way out there and all the way back, just didn't seem reasonable." The deputy explained that "construction's not a job . . . where you . . . get paid vacation time to take off." Deputy Ricard also testified that Redding, California, "is part of the Emerald Triangle. I mean, based on my training and experience, the Emerald Triangle is the largest marijuana-producing area in the United States."

Deputy Stopper also spoke to Driggers separately from Deputy Ricard. Deputy Stopper testified that Driggers was "extremely nervous. He was visibly shaking, his artery [was] pulsing, [and] he was breathing deep and heavy." When Deputy Stopper

4

asked Driggers where "they were coming from, he said the Redwoods." Deputy Stopper testified:

> "That's pretty odd to me that someone would say the Redwoods. Normally, motoring public that I talk to, when you ask them where they're coming from, they'll give a specific designation as far as a state or city, not just the Redwoods, they try to relate to you exactly where they're coming from instead of just a general region."

When Deputy Stopper asked Driggers to be more specific, Driggers said the pair had come from Redding, California. When Deputy Stopper asked what they had done in Redding, Driggers said the men visited Crudo's friend, but he only knew the friend's first name. Deputy Stopper also testified: "I asked him where they stayed at while they were out there, and he actually said they stayed in the friend's house." Deputy Stopper summarized his thoughts based on his conversation with Driggers:

> "So, all those statements seem pretty odd to me. If he traveled there for a week to visit somebody that you don't find out their last name, the fact that the traveled with a . . . fifth wheel camper across the country, and then ended up staying inside a house, then there would have been no reason to bring the trailer along with them if they ended up staying in a house. All that stuff made me actually very suspicious that criminal activity was afoot."

The deputies asked Driggers and Crudo to step from the pickup. Crudo became very irritated and verbally combative, so the deputies secured him in a patrol vehicle.

Deputy Ricard searched the interior of the pickup and found what he described as a "bud" of marijuana on the floorboard. The State presented no forensic testing of the item. During the hearing, Crudo's counsel requested production of the object. It was marked and introduced into evidence as Defense Exhibit 1. After establishing Deputy Ricard had written in his report that they found "marijuana residue on the floorboard,"

5

Crudo's counsel asked: "And you're . . . contending today that this marijuana residue was the reason that you could smell that strong odor of raw marijuana that night?" Deputy Ricard answered: "It may have been—could have been in there previously. I mean, the odor of marijuana stays around, it lingers."

The deputies then searched the trailer. Inside, they found a large quantity of marijuana in 19 vacuum-sealed packages. Crudo was arrested.

Deputy Ricard testified that he discovered a copy of the trailer's registration while searching "the vehicle" and that he had recontacted the dispatcher about the registration. According to Deputy Ricard, it was only after he had discovered the contraband that the dispatcher informed him that the registration information the dispatcher had previously provided was incorrect. The reason for the dispatcher's incorrect prior reports regarding the trailer registration was not established at the hearing.

Crudo called one witness, Gregory Clemmons, an ASE master certified mechanic and owner of Progressive Auto Repair in Junction City. Clemmons testified that he specializes in electrical repairs and that he has worked on hundreds of camper trailers. Crudo's counsel retained Clemmons to examine the pickup and trailer and determine whether the trailer's tail lamp worked.

Clemmons testified the trailer's tail lamp did work. He described the test he conducted with a "pasteboard box." Clemmons said he held the box over the trailer's license plate and found the "tag light lit the plate." Clemmons said the box was just big enough to cover the license plate and that "[i]t wasn't very dark" with the box in place. The following exchange occurred with Crudo's counsel:

"Q. . . . But [the license plate] was lighted up by the light.

"A. As far as I could tell, yeah. It wasn't —like I said, the main thing that I was looking for is the tag light that was on—

"Q. Yeah.

"A. —you could see the element in the bulb and the tag light—

Clemmons also testified that the tail lamp appeared to be original equipment on the trailer and the license plate itself was in the position "the manufacturer had designed to place the registration." Clemmons further agreed the mounting bracket between the trailer and the license plate did not appear unusual.

The State cross-examined Clemmons using Defense Exhibit 2, a still photograph taken from the video recorded from Deputy Ricard's patrol vehicle. The still photograph provides a blurred view of the back of the trailer and license plate taken on the evening of the traffic stop. The prosecutor had the following colloquy with Clemmons regarding the photograph:

"Q. Does it look like that tag lamp is actually illuminating the actual tag?

"A. In that picture, no. Well, it's hard to say. Right there at the top, maybe.

"Q. But it's not shining down on the actual tag itself, is it?

"A. Not on the whole tag, no.

"Q. No. Well, what part of the tag is it actually shining on?

"A. Just the top part of it. If you kind of look at it right here at the top, and then at the bottom."

After considering the evidence, the district court ruled from the bench. With regard to the vehicle stop, it found:  "Officer Ricard was driving down the highway that night at 11 o'clock, and looked in his rearview mirror—or looked behind him, over his shoulder, and saw what's depicted in . . . State's Exhibit 1 and Defendant's Exhibit 2." But the district court made no findings regarding whether the trailer's license plate was properly illuminated. The district judge, however, did state:

7

"If a motorist cannot depend on the manufacturer to put a license plate bracket on . . . a vehicle . . . and comply with what they believe the law is, then I don't know what the motoring public is supposed to do, except to be subject to being stopped as . . . these two folks were that evening."

With regard to the other basis upon which Deputy Ricard stopped the pickup and trailer, the district court found the dispatcher had misinformed Deputy Ricard that the trailer's registration was not on file: "They got information on some sort of registration that was wrong." The district court, however, did not address whether the vehicle stop based on this wrong registration information was illegal. Instead, it suggested the deputies were dilatory in failing to ascertain the correct registration: "They found the registration that showed it was a valid registration. They could have asked the driver for the registration, or the passenger, or the owner . . . to get that registration out and look at it, and find out it was legal. But they didn't do it."

The district court did not make specific factual findings or legal conclusions regarding whether, during the stop, the deputies developed a reasonable suspicion that the vehicles contained contraband sufficient to extend the duration of the traffic stop and further investigate their suspicions or whether probable cause existed to search the vehicles without obtaining a search warrant.

Certain aspects of the deputies' testimony were challenged or questioned by the district judge. For example, the district judge minimized Deputy Ricard's testimony that Redding, California, was in a marijuana-growing region:

"Let me just say this: I can make all kinds of presumptions on this case, because the officers always presume that certain spots are hot spots for marijuana. I've heard every place west of Kansas is a hot spot for marijuana now. Clear from Los Angeles to Vegas, clear up to British Columbia. So, there is no—and Colorado, of course. So there's

8

not anything that I know west of Junction City that's not a hot spot for marijuana. That doesn't mean anything to me at all."

The district court made no findings regarding the deputies' other reasons for suspecting the two men were engaged in drug trafficking, including the improbability of a weeklong trip across the continent and back while towing a large trailer, the vague and inconsistent answers regarding the trip, and the demeanor of Driggers and Crudo during the stop.

As for Deputy Ricard's testimony that the pickup's interior had "a strong odor of raw marijuana," the district judge surmised that the deputy's smelling of marijuana was the result of Crudo's physical appearance:

"And then they see a guy who looks like Chong from *Cheech and Chong*. No offense sir.
    "THE DEFENDANT:  None taken.
    "THE COURT:  Then I'll just put that in the record. Because he does. Okay?
    . . . .
    "THE COURT:  I think the Court of Appeal [*sic*] needs to know that he does.
And that's—that's what they saw. So, boy, if I saw him sitting in the truck, I'd probably smell raw marijuana too, because he looks like that. And we all know Cheech and Chong were kind of notorious moviemakers that smoked marijuana all the time, just for the record. And that's what he looks like. And I think that needs to be in the record in this case. And that's what happened, and that's why it happened, in the Court's opinion. And I don't like the stop a bit. Not a bit. It's really nasty to me."

Although the undisputed testimony from Deputy Ricard was that he found a bud of marijuana in the pickup's interior, the district judge determined:  "[T]his little thing that was found inside the truck . . . it was never analyzed by anybody. . . . So I don't know what it is. It looks like a sandbur to me."

9

Finally, when the district court asked rhetorically whether the deputies had "a right to do what they did that night," the court responded that the "answer to that is a vehement no." The district court said it did not think "it was a valid stop, or it was a legal stop in any manner." The district judge also suggested that traffic stops on interstate highways were a misguided use of law enforcement resources:

> "You can buy marijuana probably down across from the high school right now, sad to say. And that's probably where the police would do their best job if they patrolled that, rather than out on the interstate stopping people whizzing by at 80 miles an hour. But that's what they do. And I think that it was a pretextual stop.
> "I don't think this thing would have been stopped if the license plate would have been from Geary or Riley County, or even Shawnee County, or even anywhere in the state of Kansas."

The district court suppressed the evidence, and the State filed a timely appeal.

INTRODUCTION

On appeal, the State contends the district court "made several findings of fact that were inconsistent with the evidence" and "[t]here is not substantial competent evidence to support the trial court's granting of [Crudo's] motion to suppress." In response, Crudo posits a single issue: "The State's witnesses were not credible and should not have been believed." Crudo essentially argues that the district court's suppression ruling was proper because the district court disbelieved the law enforcement officers' testimony that justified the search and seizure.

Our standard of review requires that we review the factual underpinnings of the district court's suppression decision for substantial competent evidence, but we review its ultimate legal conclusion drawn from those facts de novo. In conducting this analysis, an appellate court may not reweigh the evidence or pass on the credibility of witnesses. *State*

10

*v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). "We also accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court." 299 Kan. at 296.

At the outset, any analysis of this suppression issue is complicated by the fact the district court did not articulate sufficient findings of fact or appropriate conclusions of law in support of its suppression ruling. Supreme Court Rule 165 (2014 Kan. Ct. R. Annot. 272) places on the district court the primary duty to provide adequate findings and conclusions on the record of the court's decision on contested matters. *State v. Herbel*, 296 Kan. 1101, 1119, 299 P.3d 292 (2013). When, as here, there was no particularized objection to the district court's inadequate findings below, an appellate court may presume the district court found all the facts necessary to support its judgment. Where the record does not support such a presumption and the lack of specific findings precludes meaningful review, however, an appellate court may consider a remand. *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014).

As will be apparent in our discussion, we conclude there was not only a lack of specific factual and legal findings to support the district court's ruling but the findings of fact that were made by the district court were not supported by sufficient evidence and also resulted in erroneous legal conclusions.

THE TRAFFIC STOP

We first address the legality of the of the traffic stop. "[W]hen a law enforcement officer [stops] a vehicle on a public roadway, constitutional issues arise because a seizure occurs within the meaning of the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights. [Citations omitted.]" *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014).

11

"In order for a law enforcement officer's seizure of a citizen to be constitutionally reasonable, the officer must know of specific and articulable facts that create a reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction. [Citations omitted.]

". . . [T]he State has the burden of establishing the reasonableness of the seizure and generally may do so by producing the officer's testimony that he or she observed a driver commit a traffic infraction before initiating the stop. This observation and testimony suffices because a traffic infraction provides an ""'objectively valid reason to effectuate a traffic stop."'" [Citations omitted.]" 300 Kan. at 637.

On appeal, the State identifies two traffic violations which it contends justified the traffic stop: "First, the non-illuminated license plate and second, the registration tag came back as not on file." We will consider both of these alleged violations individually.

*Failure to Display a Sufficiently Illuminated License Plate*

Evidence presented to the district court showed the trailer's tail lamp was working at the time of the stop and provided some illumination. Clemmons testified the tail lamp appeared to be original equipment on the trailer, and the tail lamp was affixed in the position designed by the manufacturer. Moreover, the mounting bracket did not appear unusual.

On the other hand, there was evidence the license plate was bent outwards, resulting in only the top portion of the plate being illuminated. The only testimony regarding the license plate's visibility that evening came from the deputies who, according to Deputy Stopper, were within about 20 feet of the trailer when it passed. The deputies testified that they viewed the back of the trailer for a few seconds as it passed. The deputies testified the license plate was unilluminated. In short, at the hearing, the material facts regarding the sufficiency of the tail light's illumination were disputed.

12

The district court found that Deputy Ricard "was driving down the highway that night at 11 o'clock, and looked in his rearview mirror—or looked behind him, over his shoulder" and saw the license plate on the trailer. This finding, however, was unsupported by any evidence presented at the hearing.

Regardless, the district judge resolved the disputed evidence regarding the sufficiency of the illumination of the tail light based on Clemmons' testimony that the tail light and bracket were original manufacturer's equipment:

> "If a motorist cannot depend on the manufacturer to put a license plate bracket on . . . a vehicle . . . and comply with what they believe the law is, then I don't know what the motoring public is supposed to do, except to be subject to being stopped as . . . these two folks were that evening. And I don't think it was a valid stop, or it was a legal stop in any manner, frankly."

There are two problems with the district court's findings of fact and legal conclusion. First, whether the tail lamp and bracket were original manufacturer's equipment is not relevant to whether there was a violation of K.S.A. 8-1706(c). The Kansas statute does not predicate a violation of the tail light requirement on whether the tail light and bracket are original manufacturer's equipment. As a result, the district court erred by basing its legal conclusion that K.S.A. 8-1706(c) was not violated on an irrelevant fact.

Second, what *is* critical to the determination of whether this traffic statute was violated is whether the lamp is "so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty (50) feet to the rear." K.S.A. 8-1706(c). In this regard, Deputy Stopper testified the license plate was not illuminated from a distance of about 20 feet. No contrary evidence was admitted indicating the license plate was legible from a distance of 50 feet. But the

13

district court made no findings regarding this aspect of the deputy's testimony or whether the visibility requirements of K.S.A. 8-1706(c) were met.

Crudo argues that "the district court did not believe the deputies' testimony." But we have scoured the record and find nothing to support the proposition that the district court found the deputies' testimony was not credible or was inaccurate. Rather, it appears that, in addition to basing its legal conclusion on a material fact that was irrelevant to whether the tail lamp illuminated the trailer's license plate as required by K.S.A. 8-1706(c), the district court did not properly apply K.S.A. 8-1706(c) to the facts and failed to consider the relevant factors required under that statute. This latter error was an error of law.

Accordingly, assuming the district court implicitly found Deputy Ricard did not have reasonable suspicion to believe the license plate illumination requirements set forth in K.S.A. 8-1706(c) were violated because the trailer had manufacturer's equipment, this conclusion was based on errors of fact and law. Moreover, without proper factual findings, the critical legal question of whether Deputy Stopper had reasonable suspicion to believe the trailer license plate light violated K.S.A. 8-1706(c) cannot be properly analyzed and resolved.

*No Valid Trailer Registration on File*

The State contends there was a second basis to justify the traffic stop—when the dispatcher advised Deputy Ricard on several occasions "there was no record" of the trailer's registration or that it was "not on file." After the search of the trailer and seizure of the contraband, however, Deputy Ricard found a valid registration document and called it into the dispatcher, who then confirmed the validity of the trailer's registration. These facts are undisputed although the reason for the dispatcher's erroneous reports prior to the traffic stop is unknown. Once again, Crudo asserts, without reference to the record,

14

that the district court's conclusion that this was an impermissible basis to conduct a traffic stop "hinges directly upon the credibility of the witnesses."

The district court found the deputies "got information on some sort of registration that was wrong." This fact was undisputed. The district court, however, did not address whether the vehicle stop based on this incorrect registration information was constitutionally permissible. Instead, the court suggested that, after the traffic stop, the deputies were dilatory in failing to ascertain the correct registration: "They found the registration that showed it was a valid registration. They could have asked the driver for the registration, or the passenger, or the owner . . . to get that registration out and look at it, and find out it was legal. But they didn't do it." The district court did not explain how the deputies' delay in obtaining the registration document from either Crudo or Driggers *after* the traffic stop was relevant to the essential question of whether the deputies had reasonable suspicion of an invalid registration *before* the traffic stop.

The district judge did state: "I don't think this [vehicle] would have been stopped if the license plate would have been from Geary or Riley County, or even Shawnee County, or even anywhere in the state of Kansas." The basis for the district court's observation or its relevance to the legal basis for this traffic stop is unknown, and there was no evidence presented at the hearing supporting the district court's assertion.

Kansas law provides that it is unlawful to "display . . . any . . . registration license plate . . . knowing the same to be fictitious or to have been cancelled, revoked, suspended or altered." K.S.A. 2014 Supp. 8-142 *Second*. When Deputy Ricard was advised the trailer's registration was not on file, there was some evidence that he may have concluded the license plate was fictitious or had been cancelled, revoked, suspended, or altered. In short, there was some evidence that the deputy had a reasonable, articulable belief that Crudo or Driggers were violating a Kansas traffic statute, which would justify the resulting traffic stop. Contrary to Crudo's assertion, we can find nothing in the district

15

court's ruling to support the notion that it did not believe the deputies' testimony regarding the issue of the invalidity of the trailer's registration.

On appeal, the State addresses the legal ramifications of the erroneous registration information as affecting the validity of the traffic stop. In particular, the State cites *Heien v. North Carolina*, 574 U.S. __, 135 S. Ct. 530, 536, 190 L. Ed. 2d 475 (2014), which held an officer's reasonable error of *law* is not inconsistent with reasonable suspicion to effect a traffic stop. Relevant to the case on appeal, reasonable mistakes of *fact* were already tolerated when *Heien* was decided. See *State v. Miller*, 49 Kan. App. 2d 491, 494-95, 308 P.3d 24, *rev. denied* 298 Kan. 1206 (2013). This led our own Supreme Court to comment: "After *Heien*, some might conclude it is unnecessary to characterize the officer's mistake as being one of law or fact; but the subsequent analysis as to whether the mistake was objectively reasonable can be affected by the mistake's characterization, so we consider that question as a threshold matter." *City of Atwood v. Pianalto*, 301 Kan. 1008, 1014, 350 P.3d 1048 (2015).

The circumstances in this case relate to a mistake of fact. Our Supreme Court in *Pianalto* set out the framework in such situations.

> "In mistake of fact cases, courts consider the 'reasonableness of an officer's actions using an "objective standard" that takes the "totality of the circumstances" and the "information available" to the officer into account[,]" disregarding the officer's '"actual motivations or subjective beliefs and intentions."' *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). 'That an officer's suspicions may prove unfounded does not vitiate the lawfulness of a stop . . . .' 557 F.3d at 1134. '[M]istakes of fact are rarely fatal to an officer's reasonable, articulable belief that an individual was violating a traffic ordinance at the time of a stop . . . .' *United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006)." *Pianalto*, 301 Kan. at 1015-16.

The legal effect of the erroneous registration information provided by the dispatcher prior to the traffic stop is obviously relevant to whether the traffic stop was constitutionally permissible. Yet, the district court failed to address this issue either by making necessary factual findings or a conclusion of law. Given the limited factual findings relevant to this issue of whether there was a mistake of fact, we are unable to resolve it.

Unfortunately, as in the case of the tail light, the district court did not render an ultimate legal conclusion regarding whether Deputy Ricard had reasonable suspicion to believe that the trailer's registration violated K.S.A. 2014 Supp. 8-142 *Second* prior to the vehicle stop. Moreover, the district court's factual findings relating to the deputies' delay in obtaining the registration document after the stop were not pertinent to this particular legal justification for the stop and seizure of the vehicle. Assuming the district judge impliedly found the traffic stop was constitutionally impermissible ("I don't like the stop a bit. Not a bit. It's really nasty to me"), the district court's factual findings were irrelevant and insufficient to support its ruling suppressing the evidence on this basis.

Finally, on the subject matter of the traffic stop generally, we note the district judge stated, "I think that it was a pretextual stop." The district court's use of the term, "pretextual" is noteworthy. "The United States Supreme Court has specifically held that a traffic stop is not rendered invalid by the fact it is 'a mere pretext for a narcotics search.' [Citations omitted.]" *Jones*, 300 Kan. at 638. To the extent the district court suppressed the contraband based, in whole or in part, upon its finding that the traffic stop was pretextual, this was an error of law. On remand, whether the stop was pretextual in nature is irrelevant to the constitutional analysis of the traffic stop.

On appeal, the State also challenges the district court's invalidation of the warrantless search of the vehicle and trailer based on probable cause and exigent circumstances. In particular, the State maintains that the strong odor of raw marijuana detected by Deputy Ricard and other factors provided the deputies with probable cause to conduct the vehicle search for illegal drugs.

In response, Crudo candidly concedes that "once the officer smells contraband, he has probable cause to search a vehicle." See *State v. MacDonald*, 253 Kan. 320, 324-25, 856 P.2d 116 (1993) (law enforcement officer's smell of marijuana emanating from inside the vehicle may provide probable cause to conduct warrantless automobile search). But Crudo argues that "is true so long as that is the evidence that is believed by the trier of fact." In short, Crudo asserts the district court made a credibility finding that, contrary to Deputy Ricard's testimony, he did *not* smell the strong odor of raw marijuana emanating from the passenger compartment of the truck.

> "A warrantless search by a police officer is per se unreasonable under the Fourth Amendment to the United States Constitution, unless the State can fit the search within one of the recognized exceptions to the warrant requirement. One of those exceptions is probable cause plus exigent circumstances, a subclass of which is known as the automobile exception."
>
> "Under the automobile exception, the mobility of the vehicle establishes the requisite exigency, thereby permitting a vehicle search based on probable cause alone. Probable cause to search the vehicle can be established if the totality of the circumstances indicates there is a fair probability that the vehicle contains contraband or evidence."
> *State v. Overman*, 301 Kan. 704, Syl. ¶¶ 2-3, 348 P.3d 516 (2015).

The deputies testified to several factors that convinced them there was probable cause to believe the vehicles contained drugs. However, the district court did not make findings of fact regarding these factors.

18

First and foremost, Deputy Ricard testified to smelling "a strong odor of raw marijuana" emanating from the passenger compartment of the pickup. The district judge did not directly dispute the veracity of the deputy's testimony, but he deduced the deputy's smelling of marijuana was influenced by Crudo's physical appearance, as

"a guy who looks like Chong from *Cheech and Chong*.

. . . .

". . . And that's—that's what they saw. So, boy, if I saw him sitting in the truck, I'd probably smell raw marijuana too, because he looks like that. And we all know Cheech and Chong were kind of notorious moviemakers that smoked marijuana all the time . . . . And that's what happened, and that's why it happened, in the Court's opinion."

We find no basis in the evidence or the law to support the district court's conclusion that Deputy Ricard thought that Crudo looked like Tommy Chong, or that Crudo had the appearance of an archetypal marijuana smoker, or that Crudo's appearance somehow caused the deputy's olfactory sense to mistakenly perceive the strong odor of raw marijuana. Moreover, there was no evidence that Deputy Ricard saw Crudo before smelling the odor or that Crudo's appearance at the traffic stop in January 2014 was substantially similar to his appearance at the suppression hearing in October 2014. These factual findings were specious and not probative of the critical issue of whether a strong odor of raw marijuana was noticed by Deputy Ricard.

Next, the State addresses the district court's unwillingness to find Defense Exhibit 1 was a bud of marijuana or marijuana residue. Deputy Ricard testified he found a "bud" of marijuana on the floorboard of the pickup. In evaluating this evidence, the district judge stated, "I don't know what it is." It also noted that no forensic analysis had been performed on the exhibit. Of course, the State was not required to produce scientific evidence establishing the substance was marijuana. The question was whether a reasonable law enforcement officer would conclude the item was a controlled substance by observing the vegetation. See *State v. Press*, 9 Kan App. 2d 589, 598, 685 P.2d 887,

19

*rev. denied* 236 Kan. 877 (1984); *United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000); *Enzor v. State*, 262 Ark. 545, 549, 559 S.W.2d 148 (1977). Once again, the district court made no credibility findings but apparently based its judgment on its personal knowledge of "sand bur[s]."

A critical question at the suppression hearing was the reasonableness of the search. Even if the substance was not marijuana, a reasonable mistake of fact may support probable cause. See *United States v. Nicholson*, 721 F.3d 1236, 1238 (10th Cir. 2013). The district court made no findings in this regard. Perhaps the district court thought no reasonable officer could conclude the substance was marijuana. The issue is unclear and difficult to resolve on appeal without some sense of what the substance looked like or why the district court made the comments it did.

Other circumstances factored into the deputies' probable cause calculus. As detailed in the Factual and Procedural Background section of this opinion, there was undisputed evidence of vague, inconsistent, and suspicious statements made by Crudo and Driggers; Driggers' extreme nervousness and labored breathing; and Crudo's belligerent conduct which necessitated securing him in the police vehicle. Individually, these are well-known factors that appellate courts have found to be relevant in a law enforcement officer's determination of probable cause. See *State v. Brewer*, 49 Kan. App. 2d 102, 112, 309 P.3d 676 (2013), *rev. denied* 299 Kan. 1204 (2014); *State v. Mell*, 39 Kan. App. 2d 471, 504, 182 P.3d 1, *rev. denied* 286 Kan. 1183 (2008); *Jones v. State*, 526 So. 2d 668, 671 (Ala. 1988). Once again, the district court did not make findings regarding any of these factors, although it discounted the importance of Deputy Ricard's opinion that the area from which the men were traveling, the Emerald Triangle, "is the largest marijuana-producing area in the United States."

Interestingly, on appeal, both parties address the issue of whether, assuming there was probable cause to search the pickup, it was constitutionally appropriate to also

20

conduct a warrantless search of the trailer. The district court made no factual or legal findings regarding this particular issue. Given the lack of findings, the state of the record, and the necessity to resolve the other previously discussed search and seizure issues prior to analyzing this question, we are unable to determine this particular aspect of the warrantless search of the trailer.

To the extent the district court found the deputies did not have probable cause to search the pickup and trailer, this legal conclusion is erroneous because it was not based on substantial competent evidence. Rather, the district court's legal conclusion was based on facts, assertions, and inferences not relevant to whether "the totality of the circumstances indicates there is a fair probability that the vehicle contains contraband or evidence." *Overman*, 301 Kan. 704, Syl. ¶ 3. Additionally, although evidence was presented which could have formed the basis for factual findings addressing the probable cause issue, these findings were simply not made by the district court.

CONCLUSION

"[A]n appellate court's de novo review can only be based on factual findings made by the district judge. An appellate court cannot resolve disputed facts." *Jones*, 300 Kan. at 643. As detailed in this opinion, the district court erred by making findings of fact not supported by substantial competent evidence and by not making findings of fact relevant to the legal issues presented by the suppression motion. These errors also resulted in the district court making erroneous conclusions of law regarding the validity of the traffic stop and the propriety of the warrantless search of the vehicle. Accordingly, the district court's order suppressing the contraband is reversed.

We remand the case to the district court for reconsideration of Crudo's motion to suppress. We also direct that another judge be assigned to hold a new evidentiary hearing on the motion to insure that all parties receive a fair and impartial reconsideration of this

21

matter and to avoid any appearance or suggestion that prior findings or conclusions influenced any ruling after remand. In deciding the suppression motion, the district court shall make the required findings of fact and conclusions of law. See K.S.A. 2014 Supp. 60-252; Supreme Court Rule 165 (2014 Kan. Ct. R. Annot. 272).

Reversed and remanded with directions.

* * *

ATCHESON, J., concurring in part and dissenting in part:  Although I agree this case needs to be remanded for findings and conclusions that permit a sound review of the Geary County District Court's ruling suppressing evidence, I see no reason to depart from the common practice of requiring the district court judge who heard the evidence to make a more comprehensive and comprehensible ruling. I, therefore, respectfully dissent from the majority's unusual order that the case be transferred to a different judge for a new evidentiary hearing. That is both wasteful and unwarranted.

In this case, the district court judge listened to testimony from several witnesses and received documentary evidence during the suppression hearing. Without taking a break to review notes or to rough out points to be addressed, the judge ruled from the bench. The resulting oral ruling is singularly unhelpful to us in deciding the State's appeal. We have no cogently stated findings of fact or specific conclusions of law. And while a bench ruling typically may be looser than a written decision, it still must present discernible findings and conclusions. What was announced from the bench here simply doesn't get the job done.

Without going through a point-by-point analysis of the majority's asserted deficiencies in the bench ruling, I agree the judge mistakenly positioned the patrol cars as Defendant Frank Crudo's truck and camper headed east on I-70. I also agree the judge discussed some irrelevancies—stuff that would be dicta in a written decision—and made

22

no explicit credibility determinations. So we have a mishmash of diffuse comments and observations rather than a cohesive ruling we can evaluate on appeal.

We could attempt to read between the lines of the judge's bench ruling and tease out possible and even probable findings and conclusions. But that's not our job, and the risk of erroneously construing inexact commentary is high. There is a reason we have a statute and a court rule requiring findings of fact and conclusions of law. See K.S.A. 2014 Supp. 60-252; Supreme Court Rule 165 (2014 Kan. Ct. R. Annot. 272).

The usual fix for inadequate findings and conclusions is a remand to the errant district court judge to provide a better product. See *In re Marriage of Traster*, 301 Kan. 88, 109-11, 339 P.3d 778 (2014); *In re Marriage of Lui*, No. 109,822, 2014 WL 1796152, at *2-3 (Kan. App. 2014) (unpublished opinion); *State v. Wilson*, No. 109,909, 2014 WL 1096939, at *5-6 (Kan. App. 2014) (unpublished opinion), *rev. denied* 301 Kan. ___ (February 19, 2015). I would follow that course here.

Armed with the hearing transcript and the insight that reflection permits, the judge ought to be able to fashion an appropriate set of factual findings and legal conclusions conveying his assessment of the evidence, including the credibility of the witnesses, and tying that evidence to the relevant law. He, of course, had the opportunity to see the witnesses testify and can incorporate those observations into his decision. See *State v. Franco*, 49 Kan. App. 2d 924, 936, 319 P.3d 551 (2014), *rev. denied* 301 Kan. ___ (April 29, 2015) (noting factfinder's unique vantage point in measuring credibility based on the opportunity to see witnesses as they testify, particularly on cross-examination). So too, factfinders may properly discount some or all of the testimony of witnesses they conclude have prevaricated about one or more matters. 49 Kan. App. 2d at 936. Judge Buser has pointed out those precepts of credibility determination. *State v. Jones*, 47 Kan. App. 2d 866, 882-83, 280 P.3d 824 (2012) (Buser, J., dissenting), *aff'd* 300 Kan. 630, 333 P.3d 886 (2014).*

23

[*]In *Jones*, the Court of Appeals majority upheld a ruling suppressing evidence on grounds different from those the district court used. In dissent, Judge Buser suggested the majority had effectively found facts, impermissibly usurping the district court's role. He would have remanded for the district court judge to make additional findings and conclusions. 47 Kan. App. 2d at 887 (Buser, J., dissenting). The Kansas Supreme Court ultimately affirmed the suppression order because undisputed facts supported a legal conclusion the search was unconstitutional. 300 Kan. at 632-33.

Here, however, the majority goes much further by ordering the case be reassigned to another district court judge and a new evidentiary hearing be held. That is an exceptional remedy for a district court's failure to make adequate findings of fact and conclusions of law. See *In re Marriage of Underwood*, No. 104,315, 2011 WL 6942931, at *5-6 (Kan. App. 2011) (unpublished opinion) (appellate courts seldom remand with orders to reassign cases to new judges and "do so reluctantly"); see also *United States v. Wolf Child*, 699 F.3d 1082, 1102-03 (9th Cir. 2012) (remand with order of reassignment to new judge done only in "unusual circumstances"). In *Underwood*, for example, this court ordered reassignment because the district court judge seriously misstated and misapplied the controlling law and, based on that misunderstanding, had expressed a strong disposition to deny a motion before hearing any of the evidence. 2011 WL 6942931, at *5. We haven't a comparable situation here. Rather, we have a fractured recitation of findings and conclusions after a hearing that can be rectified with some time and attention from the original judge. There is no reason for a new evidentiary hearing requiring the parties, counsel, and witnesses to assemble and replicate what has already been done.

In *Jones*, Judge Buser noted the district court had premised its ruling granting the motion to suppress on an erroneous legal conclusion, as the majority recognized. Given the district court's opportunity to see and hear the witnesses during the suppression hearing, he advocated remand "with directions that the district court make the necessary factual findings, reconsider its conclusion of law, and provide the litigants and our court with its best legal judgment regarding whether the evidence should be suppressed." 47

24

Kan. App. 2d at 887 (Buser, J., dissenting). "This," he said, "is a suitable remedy for situations, like this one, where the district court's factual findings or legal conclusions are insufficient for appellate review." I would throw in with that Judge Buser, not today's version.